IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MAMADOU NDOM,                          §
                                       §
                    Plaintiff,         §
                                       §   Civil Action No. 3:16-CV-3432-D
VS.                                    §
                                       §
KIRSTJEN NIELSEN, et al.,              §
                                       §
                    Defendants.        §

MEMORANDUM OPINION
AND ORDER

        In this declaratory judgment action, plaintiff Mamadou Ndom ("Ndom"), a native

citizen of Senegal, seeks review under the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701-706, and the federal Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, of a

decision of United States Citizenship and Immigration Services ("USCIS")[1] to deny his

application for adjustment of status. Concluding that the doctrine of collateral estoppel does

not preclude USCIS' denial of Ndom's application and that USCIS did not act arbitrarily and

capriciously in concluding that Ndom was inadmissible under the statute, the court denies

---

        [1]In his amended complaint, Ndom names as defendants the Secretary of the
Department of Homeland Security ("DHS"), the Director of USCIS, and various other
directors and assistant directors within USCIS, all in their official capacities. It is clearly
established that a suit against a government official in his official capacity is "only another
way of pleading an action against an entity of which [the official] is an agent." *Monell v.
Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 n.55 (1978) (addressing 42 U.S.C. § 1983);
*see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (same) ("As long as the government
entity receives notice and an opportunity to respond, an official-capacity suit is . . . treated
as a suit against the entity."). Accordingly, Ndom's claims are treated as having been
brought against DHS and USCIS.

Ndom's motion for summary judgment, grants USCIS's motion for summary judgment, and dismisses this action by judgment filed today.

I

Before the court discusses the factual and procedural history of this case, it sets out the relevant legal framework of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101 *et seq.*, which governs applications for asylum and adjustment of status of refugees.

A

Ndom was granted asylum under 8 U.S.C. § 1158, which permits refugees to seek asylum when "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). The statute prohibits the government from granting asylum, however, to any alien who has "engaged in a terrorist activity," which under the current version of the statute[2] includes providing material support to a Tier III terrorist organization,[3] "unless the

_____

[2]In early 1998, when Ndom petitioned for asylum, "engaging in terrorist activity" was defined as follows:

> to commit, in an individual capacity or as a member of an organization, an act of terrorist activity or an act which the actor knows, or reasonably should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time, including . . . providing . . . any type of material support, including a safe house, transportation, communications, funds, false documentation or identification, weapons, explosives, or training, to any individual the actor knows or has reason to believe has committed or plans to commit a terrorist activity.

actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI).

An alien who has been granted asylum is eligible for an adjustment in status to that of permanent resident if, after being physically present in the United States for at least one year, he is otherwise "admissible . . . as an immigrant under this chapter at the time of examination for adjustment." 8 U.S.C. § 1159(b). But aliens who engage in terrorist activities, as defined under the same statute used in asylum proceedings, are not admissible. *See id.* at § 1182(a)(3)(B)(i)(I). "In other words, both 8 U.S.C. § 1158 (the statute governing petitions for asylum) and 8 U.S.C. § 1159 (the statute governing petitions for permanent resident status), look to 8 U.S.C. § 1182 (the statute governing inadmissible aliens) to determine whether an alien is eligible for relief." *Amrollah v. Napolitano*, 710 F.3d 568, 571 (5th Cir. 2013) .

### B

Ndom is from the Casamance region of southern Senegal.[4] In 1990, when he was 15

_____

8 U.S.C. § 1182(a)(3)(B)(iii)(1998).

[3]A Tier III terrorist organization refers to "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)" in 8 U.S.C. § 1182. 8 U.S.C. § 1182(a)(3)(b)(vi)(III).

[4]Because both sides move for summary judgment, the court will recount the evidence that is undisputed, and, when it is necessary to set out evidence that is contested, will do so favorably to the side who is the summary judgment nonmovant in the context of that evidence. *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718

years old, Ndom joined the *Mouvement des forces démocratiques de Casamance* (in English, the "Movement of Casamance Democratic Forces") ("MFDC"), which had in May of that year launched a campaign of armed opposition to the Senegalese government. Ndom contends that he joined MFDC "because he believed it was involved in a peaceful struggle to gain Casamance independence." P. 5/7/18 Br. 3.

During the period of his membership in MFDC, Ndom regularly attended MFDC meetings, and he understood that, as a member of MFDC, it was his duty to "follow orders." *Id.* On one occasion in 1992, Ndom and others were asked to carry bags to a bridge that linked two areas of Casamance and then to run home. Ndom contends that he did not know what was inside the bags, that he "couldn't say no," and that he later discovered that the bag that he had transported contained dynamite and that MFDC had intended to blow up the bridge. *Id.* Ndom remained a member of MFDC until the end of 1993, when he left the organization because it had renounced its prior non-violent approach to secession and was increasingly killing civilians, including children and some of Ndom's acquaintances.

Ndom was twice arrested by the Senegalese authorities, once in December 1994 and once in March 1995. He maintains that both arrests were because the Senegalese government suspected that he was a member of MFDC. In April 1997 Ndom was seriously injured when a land mine exploded near him. After his release from the hospital, Ndom resolved to leave Senegal and seek asylum in the United States. He sold his family farm and livestock to pay

n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

for a forged passport and passage to Canada, and from there he entered the United States.

In early 1998 Ndom applied for asylum in the United States. His application stated that he had a well-founded fear of future persecution on account of his political opinion and his membership in a social group.[5] After interviewing Ndom, an Immigration and Naturalization Service ("INS")[6] asylum officer determined that he was ineligible for asylum and referred his claim to the immigration court. Following several hearings, the immigration judge ("IJ") denied Ndom's asylum application, holding:

> this Court is not satisfied that on this record the Respondent was persecuted on these occasions [(i.e., the December 1994 and March 1995 arrests)], but was the victim of civil and military strife in the area. Therefore he has not established that he was persecuted on account of any one or more of the five factors for consideration in Senegal.

R. 515. Ndom appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), which affirmed the IJ's denial of asylum without opinion on November 25, 2002.

Ndom then petitioned the Ninth Circuit for review. The Ninth Circuit concluded that Ndom's treatment by the Senegalese armed forces constituted persecution "at least in part on account of imputed political opinion," and held that Ndom "is eligible for asylum." *Ndom*

---

[5]In the declaration submitted with his asylum application, Ndom averred: "I know that if I return to Senegal I will be jailed and killed because the government thinks that I belong to the MFDC. I was arrested twice already and I don't think the police will be so lenient with me this time. I am therefore requesting asylum in the United States." R. 1003.

[6]The INS was abolished effective March 1, 2003 as a result of the enactment of the Homeland Security Act. Following the dissolution of the INS, USCIS is the immigration agency within the DHS responsible for the adjudication of benefits.

*v. Ashcroft*, 384 F.3d 743, 756 (9th Cir. 2004). The panel remanded the case to the BIA "for a determination of whether Ndom should be granted asylum." *Id.* On March 2, 2005 the BIA entered an order granting Ndom asylum in the United States.[7]

On March 27, 2006 Ndom filed an I-485 Application to Register Permanent Residence or Adjust Status ("Application") with USCIS. More than ten years later, Ndom filed this lawsuit seeking an order mandating that the defendants immediately adjudicate his Application, which Ndom maintained had been unlawfully delayed for ten years. On June 9, 2017 USCIS issued Ndom a notice of intent to deny ("NOID") the Application based on his membership in, and material support of, a Tier III undesignated terrorist organization under 8 U.S.C. § 1182(a)(3)(B). In his response to the NOID, Ndom argued, *inter alia*, that the issue of his inadmissibility had been previously decided when the immigration court granted him asylum; that by granting his application for asylum, the immigration court had

---

[7]The March 2, 2005 BIA order states, in full:

> In a decision dated September 10, 2004, the United States Court of Appeals for the Ninth Circuit found the respondent eligible for asylum, and remanded the case for the Board to exercise its discretion on the asylum application. If one starts with the premise that the respondent is eligible for asylum, as found by the court, then we would find no basis for denying his application for asylum in the exercise of discretion. Accordingly, the Board's decision in this case dated November 25, 2002, is vacated, the application for asylum is granted, and the removal proceedings are terminated. In view of the termination of proceedings, any application for withholding of removal is moot.

R. 435 (citations omitted).

necessarily determined that he was not inadmissible under any paragraph of 8 U.S.C. § 1182(a)(3)(B)(i); and that USCIS was bound by the immigration court's decision under principles of collateral estoppel. USCIS, however, rejected these arguments, issuing a decision denying Ndom's Application based on evidence that he was a member of, and provided material support to, MFDC, which USCIS concluded met the definition of an undesignated terrorist organization under 8 U.S.C. § 1182(a)(3)(B)(vi)(III).[8]

Ndom then amended his complaint to challenge USCIS's denial of his Application. In his amended complaint, Ndom alleges that USCIS's denial of his Application violates established principles of collateral estoppel and is arbitrary, capricious, and contrary to established law, and that it should be set aside under the APA. Both sides move for summary judgment.

## II

Each movant's summary judgment burden depends on whether he or it is moving for relief on a claim or defense for which he or it will have the burden of proof at trial. To be

---

[8]On the issue of collateral estoppel, USCIS explained, *inter alia*:

> your material support to the MFDC was not at issue when you were granted asylum. Although you argue that you could not have been granted asylum if a bar to asylum applied, such as a bar under INA § 212(a)(3)(B), and that therefore this bar must necessarily have been found not to apply, that an issue was necessarily decided does not mean that the issue was "actually litigated" as required for purposes of collateral estoppel.

R. 10.

entitled to summary judgment on a claim or defense for which the movant will have the burden of proof, the moving party "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that the moving party must demonstrate that there are no genuine and material fact disputes and that the moving party is entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

When the summary judgment movant will not have the burden of proof at trial on a claim or defense, the moving party need only point the court to the absence of evidence of any essential element of the opposing party's claim or defense. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmovant must go beyond his or its pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *TruGreen Landcare, L.L.C. v. Scott*, 512

F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory

where the nonmoving party fails to meet this burden.  *Little*, 37 F.3d at 1076.

III

Under the APA, "[a] person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute,

is entitled to judicial review thereof."  5 U.S.C. § 702.  In particular, a "reviewing court shall

. . . hold unlawful and set aside agency action, findings, and conclusions found to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*.

§ 706(2)(A); *Defensor v. Meissner*, 201 F.3d 384, 386 (5th Cir. 2000).  Agency action is

arbitrary and capricious

> if the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision
> that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view
> or the product of agency expertise.

*Luminant Generation Co. v. U.S. Envtl. Prot. Agency*, 675 F.3d 917, 925 (5th Cir. 2012)

(quoting *Tex. Oil & Gas Ass'n v. Envtl. Prot. Agency*, 161 F.3d 923, 955 (5th Cir. 1998)).

The scope of review of agency actions under Section 706(2)(A) is "very narrow."

*Delta Found., Inc. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (quoting *Louisiana v.

Verity*, 853 F.2d 322, 327 (5th Cir. 1988)).  "The court's role is not to weigh the evidence pro

and con but to determine whether the agency decision 'was based on a consideration of the

relevant factors and whether there was a clear error of judgment.'"  *Id*. (quoting *Verity*, 853

F.2d at 327). "Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary and capricious." *Id.* (quoting *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994)). "The 'agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record.'" *Id.* (quoting *Harris*, 19 F.3d at 1096). "A presumption of validity attaches to agency action, and the burden of proof rests with the party challenging such action." *Miss. Hosp. Ass'n, Inc. v. Heckler*, 701 F.2d 511, 516 (5th Cir. 1983) (citation omitted).

IV

The court considers, first, the parties' cross motions for summary judgment on Ndom's APA claim based on the allegation that USCIS is collaterally estopped from denying his Application based on a determination that he is inadmissible as a result of having provided material support to an undesignated Tier III terrorist organization.

A

Under the doctrine of collateral estoppel—also known as issue preclusion—"when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290 (5th Cir. 1995) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970), and citing Restatement (Second) of Judgments § 27 (1982)), *overruled on other grounds as recognized by In re Ritz*, 832 F.3d 560 (5th Cir. 2016). "The applicability of collateral estoppel is a question of law," *Test Masters Educational Services, Inc. v. Robin*

*Singh Educational Services, Inc.*, 799 F.3d 437, 444 (5th Cir. 2015) (quoting *Kariuki v. Tarango*, 709 F.3d 495, 506 (5th Cir. 2013)), and "depends on three elements: (1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a necessary part of the judgment in that earlier action," *RecoverEdge L.P.*, 44 F.3d at 1290 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 & n.5 (1979); *Sheerin v. Davis* (*In re Davis*), 3 F.3d 113, 114 (5th Cir. 1993)); *see also Amrollah*, 710 F.3d at 571 ("Issue preclusion, also known as collateral estoppel, applies when '(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision.'" (quoting *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (en banc))).

## B

Because the court concludes as a matter of law that the question whether Ndom is inadmissible because he engaged in a terrorist activity was not "actually litigated" during Ndom's asylum proceedings, it grants defendants' motion for summary judgment on Ndom's APA claim based on the doctrine of collateral estoppel.

### 1

Under Fifth Circuit and other federal authority, it is clearly established that, for an issue to be "actually litigated" for collateral estoppel purposes, the issue must be "raised, contested by the parties, submitted for determination by the court, and determined." *In re Keaty*, 397 F.3d 264, 272 (5th Cir. 2005) (citing cases); *see also Gambino v. Koonce*, 757

F.3d 604, 608-09 (7th Cir. 2014) ("[A]ctually litigated does not mean thoroughly litigated, but only that the parties disputed the issue and the trier of fact resolved it. It can be satisfied even if only a slight amount of evidence was presented on the disputed matter decided in the first suit." (citations and internal quotation marks omitted)); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 561 (4th Cir. 1987) ("Collateral estoppel is appropriate where the identical issue was 'actually litigated, that is, contested by the parties and submitted for determination by the court,' where the issue was 'actually and necessarily determined by a court of competent jurisdiction,' and where preclusion does not work an unfairness in the second trial." (citations omitted)); *James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451, 459-60 (5th Cir. 1971) ("As a general rule, where a question of fact is put in issue by the pleadings, and is submitted to the jury or other trier of facts for its determination, and is determined, that question of fact has been 'actually litigated.'" (citation omitted)); Restatement (Second) of Judgments § 27 cmt. d (1982) (stating that an issue is actually litigated when it is "properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined").

As USCIC argues in its brief, although the IJ evaluated Ndom's affiliation with MFDC during the asylum proceedings, the IJ never reached a determination on the question whether Ndom's activities with MFDC barred him from a grant of asylum. The IJ described Ndom's affiliation with MFDC, including the bridge incident, noting that "this [(i.e., transporting an item that might have contained dynamite or some other explosive device)] was the only activity which [Ndom] performed according to his testimony, which in the opinion of the Court could be considered a terrorist activity or in any[]way assisting in a

terrorist activity for purposes of asylum." R. 506. But because the IJ denied the asylum application based on his conclusion that Ndom "has not established that he was persecuted on account of any one or more of the five factors for consideration in Senegal," *id.* at 515, the IJ never reached any conclusion with respect to the question whether Ndom's activities with MFDC constituted "engag[ing] in a terrorist activity," so as to render him inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I).

Nor did the Ninth Circuit ever reach a decision on, or even address, the question whether Ndom's activities with MFDC rendered him inadmissible under § 1182. In his brief, Ndom argues that the Ninth Circuit "unequivocally held in a precedent decision that 'Ndom is eligible for asylum.'" P. 5/29/18 Br. 13 (quoting *Ndom*, 384 F.3d at 756). Ndom correctly quotes the language from the Ninth Circuit's decision reversing the IJ's denial of asylum. But in reaching its holding, the Ninth Circuit was not presented with the question whether Ndom was inadmissible under § 1182 as a result of his affiliation with, and activity involving, MFDC. The only issue that the Ninth Circuit reviewed was the IJ's determination that Ndom did not fit within the definition of "refugee," because he failed to establish that he was persecuted on account of any of the five factors for consideration. *Ndom*, 384 F.3d at 750. Thus the Ninth Circuit's statement that Ndom "is eligible for asylum" did not encompass a finding on the issue of Ndom's inadmissibility under § 1182. Nor was Ndom's inadmissibility under § 1182 contested by the parties or submitted for decision after the Ninth Circuit remanded the case to the BIA. In fact, in its March 2, 2005 order, the BIA started with the "premise that the respondent is eligible for asylum," and, based on that premise,

granted the application for asylum.  R. 435.

In sum, although the BIA ultimately granted Ndom's asylum application, which, under binding Fifth Circuit authority "necessarily included, under the structure of the statute, a finding that [Ndom] did not provide support to an individual or organization that engaged in terrorist activities," *Amrollah*, 710 F.3d at 572, the court concludes that, due to the procedural posture of this case, the pertinent issue, i.e., whether Ndom's activities involving MFDC rendered him inadmissible under § 1182, was never "actually litigated," as required for collateral estoppel to apply.

2

In his summary judgment motion and in opposition to USCIS's motion, Ndom contends that he "was questioned 'extensively about his support of the [MFDC] during the asylum proceeding,'" P. 5/29/18 Br. 11 (alteration in original) (quoting *Amrollah*, 710 F.3d at 571), and that "the IJ was undoubtedly aware about Ndom's membership in the MFDC and about his activities with the organization . . . [and] concluded that Ndom was not ineligible for asylum based on his alleged support to the MFDC," *id.* at 12.  He maintains that it was unquestionably the IJ's duty to consider whether Ndom was ineligible for asylum for providing material support to a foreign terrorist organization ("FTO"), citing *Amrollah* for the proposition that "the immigration judge was *not permitted* to grant asylum to [Ndom] if he satisfied any of [the] exceptions to admissibility under § 1182, including providing material support to any individual or organization that engaged in terrorist activities."  P. 5/29/18 Br. 13 (first alteration in original) (quoting *Amrollah*, 710 F.3d at 571-72).  The court

is unpersuaded by Ndom's arguments.

The IJ did *not* conclude, as did the IJ in *Amrollah*, that Ndom was eligible for asylum. Nor did he conclude, as Ndom posits, that Ndom was not ineligible under § 1182. In fact, the IJ made *no* finding with regard to Ndom's admissibility or inadmissibility under § 1182, noting only that Ndom had performed an activity that "could be considered a terrorist activity," R. 506, and holding him inadmissible on a separate ground: that he had not established that he was persecuted on account on any one or more of the five factors enumerated in the statute. In contrast, in *Amrollah* the IJ specifically concluded: "[a]lthough the Service attorney hints, or hinted that Respondent's support of the Mujahedeen indicated violent activity which might disqualify the respondent from being eligible for asylum, . . . Respondent's testimony showed he did not commit any violent act, and . . . he was therefore eligible for asylum under 8 U.S.C. § 1158." *Amrollah*, 710 F.3d at 570 (internal quotation marks omitted). Thus in *Amrollah* the question of the plaintiff's inadmissibility under 8 U.S.C. § 1158 was raised, contested by the parties, submitted for determination by the court, and determined, as is required to establish that the issue was "actually litigated" for collateral estoppel purposes. *See In re Keaty*, 397 F.3d at 272.

Moreover, even if the passage Ndom quotes from *Amrollah* would support the conclusion that, by ultimately granting him asylum, the BIA[9] *necessarily decided* that Ndom

_____

[9]As noted above, Ndom asserts that the Ninth Circuit "unequivocally held in a precedent decision that 'Ndom is eligible for asylum.'" P. 5/28/19 Br. 13 (quoting *Ndom*, 384 F.3d at 765). Although under the reasoning in *Amrollah* the Ninth Circuit's holding would suggest that it "necessarily decided" that Ndom was not inadmissible under § 1182, there is

was not inadmissible under § 1182, the "necessarily decided" element of collateral estoppel is distinct from and "cannot be conflated with" the "actually litigated" element of collateral estoppel. *See Janjua v. Neufeld*, 2017 WL 2876116, at *9 (N.D. Cal. 2017) ("Just because the issue was necessarily decided does not necessarily mean it was actually litigated under federal collateral estoppel doctrine."); *see also Johnson v. United States*, 576 F.2d 606, 611 (5th Cir. 1978) (noting that, under res judicata, "a judgment in a prior suit between the same parties bars a suit on the same cause of action not only as to all matters offered at the first proceeding, but also as to all issues that could have been litigated"; in contrast, collateral estoppel "precludes relitigation only of those issues actually litigated in the original action, whether or not the second suit is based on the same cause of action"). As explained above, "actually litigated" means that the issue was contested by the parties, submitted for determination by the court, and determined. *In re Keaty*, 397 F.3d at 272. There is no indication in the record that Ndom's activities involving MFDC were contested or that the government previously took the position that Ndom was inadmissible under § 1182 as a result of his actions involving MFDC. And as explained above, none of the courts involved in Ndom's asylum proceedings made any determination with respect to the question whether Ndom's involvement with MFDC rendered him inadmissible under § 1182.

---

no indication in the *Ndom* opinion that the issue whether Ndom's support of MFDC rendered him inadmissible under § 1182 was a contested issue. Nor did the Ninth Circuit make any determination or even discuss this issue.

The court holds as a matter of law that the issue of whether Ndom "engaged in terrorist activities" and was thus inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) was not actually litigated, for purposes of collateral estoppel, during Ndom's asylum proceedings. Accordingly, because the doctrine of collateral estoppel does not bar USCIS from concluding that Ndom is inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I), the court grants USCIS' motion for summary judgment on Ndom's APA claim based on the doctrine of collateral estoppel and denies Ndom's motion for summary judgment on this claim.

V

Having determined that the doctrine of collateral estoppel did not preclude USCIS from denying Ndom's Application, the court turns next to Ndom's claim that USCIS's denial of his Application was arbitrary and capricious under the APA.

A

USCIS moves for summary judgment on Ndom's APA claim, contending that its determination that Ndom was inadmissible for providing material support to a Tier III organization is supported by the record. It posits that the record shows that MFDC was a Tier III organization; Ndom was a member of MFDC, voluntarily joining the organization and routinely attending meetings; Ndom provided material support to MFDC by informing others of organization meetings and performing other actions in support of the organization; and Ndom failed to demonstrate that he lacked knowledge of MFDC's activities.

In opposition to USCIS's motion, Ndom contends that USCIS acted arbitrarily and

capriciously in concluding that the "group of two or more individuals" Ndom supported was a Tier III terrorist organization when Ndom's credible testimony during his asylum proceedings established that he joined his branch of MFDC when it was non-violent and quit after it became violent: "[c]onsequently, when Ndom supported a group of two or more individuals in the MFDC in Casamance, Senegal between 1990-1993, his particular group was not a Tier III FTO." P. 5/29/18 Br. 15. Ndom also contends that USCIS failed to make any finding that the group Ndom actually supported was engaged in terrorist activities *sanctioned by the organization's leaders*. He next maintains that the record proves that he lacked knowledge about MFDC's alleged terrorism, and that it was arbitrary and capricious for USCIS to reject, without any basis, his credible testimony on this issue. Finally, Ndom contends that his support of MFDC—i.e., his following orders when he was only a teenager—was not material because he did not provide MFDC with a "valuable resource." *Id.* at 18.

In its reply, USCIS contends that the record amply supports the determination that MFDC constituted a Tier III terrorist organization at the time Ndom was a member and provided material support; that the violence that Ndom's purported faction engaged in was authorized because the destruction of the bridge, in which Ndom was involved, required planning and a significant number of MFDC's members to complete; that Ndom did not establish by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization because Ndom testified that he regularly attended MFDC meetings from 1990 until 1993 during the period when the

organization was engaging in the ongoing conflict with the Senegalese government, the record shows that reports from the region indicate that MFDC as a whole engaged in intense acts of violence throughout the time when Ndom was a member, and Ndom was aware of MFDC's violent activities—including the destruction of a bridge in 1992—well in advance of his dissociation at the end of 1993; and that the definition of "material support" is broad enough to encompass Ndom's being a member of MFDC for three years, informing others about MFDC's meetings, and carrying a bag of dynamite for MFDC so the organization could destroy a bridge.

B

Under 8 U.S.C. § 1182(a)(3)(B)(i), any alien who has engaged in a terrorist activity is inadmissible. The statute defines "engage in terrorist activity" to include, *inter alia*,

> to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training . . . to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv)(VI). A "terrorist organization described in clause (vi)(III)," i.e., a "Tier III" undesignated terrorist organization, refers to "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv). *Id.* § 1182(a)(3)(B)(vi)(III).

The court begins with Ndom's contention that USCIS's determination that the faction of MFDC of which Ndom was a member from 1990 until 1993 was a Tier III terrorist organization was arbitrary and capricious. The court concludes that it was not.

In denying Ndom's Application, USCIS devoted several pages to its explanation of why it determined that MFDC fell within the definition of a Tier III terrorist organization during the period of time in which Ndom was involved. According to USCIS:

> [a] group falls within the definition of an undesignated, or Tier III, terrorist organization when it engages in terrorist activity or has a subgroup that engages in terrorist activity, as defined in INA § 212(a)(3)(B). Country conditions information indicates that the MFDC, in its various factions and permutations, has engaged in a low-intensity conflict against the Senegalese government and maintained control over different parts of the Casamance by the use of force for well over two decades. The MFDC publicly announced it was engaged in armed conflict with the government during the spring of 1990. Armed combat and attacks on civilians both constitute terrorist activity under INA § 212(a)(3)(B). Therefore, the MFDC is considered to fall within the definition of a Tier III terrorist organization during the time you were involved with it from 1990-1993.

R. 2-3. USCIS then detailed the evidence on which it relied to conclude that MFDC fell within the definition of a Tier III organization at the time of Ndom's involvement, including expert reports indicating that "though many members of the organization would not have been aware of violent activity until the actual declaration of hostilities, they would have known of the group's violence after that declaration [in 1990]." R. 5. Ndom's testimony before the IJ was consistent with the documentary evidence on which USCIS relied. He

testified that, during the time when he was associated with MFDC, in "about 1992," its members killed and mutilated people and destroyed a bridge.

Ndom argues that it was "arbitrary and capricious for USCIS to simply label Ndom's 'group' as MFDC and then credit Ndom's group with all of MFDC's alleged acts of terrorism without ever bothering to interview Ndom face-to-face to determine the actual activities of the 'group of two or more individuals' he supported from 1990-1993." P. 5/29/18 Br. 14. He then criticizes USCIS for overlooking his credible testimony that he joined his branch of MFDC when it was non-violent, and quit after it became violent. He argues that when *he* supported a group of two or more individuals in MFDC in Casamance, Senegal between 1990 and 1993, "his particular group was not a Tier III FTO." *Id.* at 15.

Even if the court accepts as true that Ndom joined his particular branch of MFDC when he believed it was "non-violent," and left after it increasingly began "killing civilians, including children and some of Ndom's acquaintances," *id.*, it is undisputed that Ndom's "branch" of MFDC engaged in terrorist activity during the period of his membership. As stated above, a "Tier III" undesignated terrorist organization is defined as a group of two or more individuals which engages terrorist activity. 8 U.S.C. § 1182(a)(3)(B)(vi)(III). "Terrorist activity" includes the use of any "explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." *Id.* § 1182(a)(3)(B)(iii)(V). During his asylum proceedings, Ndom testified that, during the period in which he was a member of MFDC, at the direction of MFDC, he transported bags

that contained dynamite for the purpose of destroying a bridge. This evidence is alone sufficient to support USCIS's finding that MFDC constituted a Tier III undesignated terrorist organization during the period of Ndom's membership. *See* R. 6 (USCIS stating, in decision denying Application, "Specifically, the MFDC has engaged in terrorist activity as defined at INA § 212(a)(3)(B)(iii)(V)(b)(the use of an explosive, firearm, or other weapon or dangerous device, for other than mere monetary gain, with the intent to endanger the safety of one or more individuals or to cause substantial damage to property)."). The court concludes that USCIS did not act arbitrarily and capriciously in concluding that the group of two or more individuals that Ndom supported from 1990-1993 met the definition of a "Tier III" undesignated terrorist organization.[10]

---

[10]The court also rejects Ndom's argument that USCIS failed to make any finding that the group Ndom actually supported was engaged in terrorist activities sanctioned by the organization's leaders. As USCIS argues in its reply:

> the destruction of the bridge—in which Ndom was involved—required planning . . . and required a significant number of the MFDC's members to complete . . . . This is indicative of the fact that the act was authorized, if not by the MFDC leadership writ large, at least by leadership of the purported faction with which Ndom was involved. That it occurred after the MFDC had declared an armed rebellion in May 1990 and had launched armed attacks in the spring of 1990, which continued throughout Ndom's membership, also indicates that the bombing of the bridge was authorized, as were other violent activities carried out by the group.

D. 6/12/18 Br. 8-9 (citations omitted). Moreover, Ndom does not deny that he stated in an April 11, 2009 letter sent to the Texas Service Center that "the vandalism [i.e., the destruction of a bridge] was approved conducted and sponsored by senior members of MFDC." R. 8.

D

The court next considers Ndom's argument that USCIS acted arbitrarily and capriciously in denying his Application despite evidence in the record that proves that he lacked knowledge of MFDC's alleged terrorism.

An individual who provided material support to a Tier III terrorist organization is not inadmissible if he "can demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). In his brief, Ndom contends that he "testified repeatedly that he did not know about MFDC's alleged terrorism when he was affiliated with the group as a teenager from 1990 until 1993," P. 5/29/18 Br. 16; that every adjudicator or judge who listened to him testify found him to be credible; and that because his credibility is firmly established, "it follows . . . that his claim that he lacked knowledge about MFDC's acts of terrorism is worthy of belief." *Id.* The court disagrees.

In denying Ndom's Application, USCIS noted:

> You . . . stated that you participated in "acts of collective sabotage." Specifically, you explained that in 1992, you participated in the destruction of a bridge by carrying dynamite to the site. In your Asylum interview you stated that you did it willingly, as you "wanted the government to notice the injustice (against people from Casamance)."

R. 6. Ndom does not contend that using dynamite to destroy a bridge is *not* an act of terrorism, as defined in 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b) (defining "terrorist activity" to include "[t]he use of any . . . explosive, firearm, or other weapon or dangerous device (other

than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property."). Nor does he deny that he knew, in 1992, that MFDC had engaged in this act of terrorism (and, in fact, provided material support to MFDC in relation to this incident, *see infra* § V(E)), and that, despite this knowledge, Ndom remained a member of the group until the end of 1993. Accordingly, regardless of what Ndom did or did not know about the extent of MFDC's *other* violent acts during the period of his membership, it is undisputed that, at the very least, he knew about the bridge incident in 1992, yet remained a member of MFDC until the end of 1993. This undisputed evidence undermines Ndom's argument that the "clear and convincing evidence" establishes that he did not know that MFDC was a terrorist organization. Under the deferential arbitrary and capricious standard, coupled with the fact that the burden is on Ndom to prove his lack of knowledge by clear and convincing evidence, the court concludes that Ndom's repeated testimony that he "did not know about MFDC's alleged terrorism when he was affiliated with the group as a teenager from 1990 until 1993," P. 5/29/18 Br. 16, is insufficient to establish that USCIS's determination that Ndom cannot claim lack of knowledge was arbitrary and capricious.

E

Finally, the court considers whether USCIS's determination that Ndom provided "material" support to MFDC was arbitrary and capricious.

1

The INA defines "material support" to include the provision of "a safe house,

transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons . . . , explosives, or training." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). "Material support," however, is a "broad concept" that is not limited to the enumerated examples. *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298-99 (3d Cir. 2004) ("No language in the statute limits 'material support' to the enumerated examples. Use of the term 'including' suggests that Congress intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories."); *see also, e.g., Haile v. Holder*, 658 F.3d 1122, 1129 (9th Cir. 2011) ("We have previously remarked on the broad scope of the terrorism bars, and the definition of 'material support' is broad enough to cover [collecting funds, supplying provisions such as sugar, shoes, and cigarettes, and passing along secret documents]." (citation omitted)). In the criminal context,[11] the Supreme Court has explained:

> "Material support" is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks.

---

[11]Although in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Court was interpreting 18 U.S.C. § 2339A(b)(1)—which defines "material support or resources" to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials,"—the parties appear to agree that *Holder*'s interpretation of the term "material support" applies in this case. *See, e.g.,* Ds. 5/7/18 Br. 11, 14; P. 5/29/18 Br. 18.

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

In denying Ndom's Application, USCIS concluded that his activities, which included attending MFDC meetings from 1990 until 1993, informing people about MFDC meetings, and providing his own labor in support of the group's activities, including transporting for the group a package that he later learned contained explosives, amounted to "material support." Courts have repeatedly upheld findings that an alien's support was material, "even if it was relatively low-level." *Sesay v. Attorney Gen. of U.S.*, 787 F.3d 215, 221 (3d Cir. 2015) (citing cases); *see, e.g., Tahir v. Lynch*, 654 Fed. Appx. 512, 515 (2d Cir. 2016) (holding that BIA "reasonably concluded that Tahir provided material support to a terrorist organization because he designed and printed communications materials, such as brochures, posters, and banners, for the Sipah-e-Sahaba . . . in Pakistan in the mid-1990s."); *Sesay*, 787 F.3d at 222 ("carrying weapons and ammunition for a terrorist group" constitutes material support); *Khan v. Holder*, 766 F.3d 689, 698 (7th Cir. 2014) (concluding that distributing flyers, posting signs, looking after the local office, and recruiting individuals to attend meetings constituted "material support"); *Viegas v. Holder*, 699 F.3d 798, 803 (4th Cir. 2012) (upholding finding of material support because alien "paid dues and hung posters" for a terrorist group); *Barahona v. Holder*, 691 F.3d 349, 351-52, 356 (4th Cir. 2012) (upholding finding of material support because alien, under threat, allowed terrorists to use his kitchen, gave them directions through the jungle, and occasionally allowed them to stay overnight); *Haile*, 658 F.3d at 1129 (upholding finding of material support because alien collected funds,

passed along secret documents and supplied the terrorist organization with sugar, shoes, and cigarettes); *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008) (upholding finding of material support because alien recruited and solicited funds for terrorist group); *Singh-Kaur*, 385 F.3d at 298-99 (deferring to the BIA's conclusion that the "provision of food and setting up tents" qualified as "material support"). The court is unable to conclude that, in finding in this case that Ndom provided MFDC with "material support," USCIS acted arbitrarily and capriciously.

3

Ndom maintains that his support was not material because he was a teenager when he was a member of MFDC and no member of MFDC asked him to return when he stopped attending their meetings. In his summary judgment motion Ndom contends:

> [n]o evidence indicates that Ndom's unspecified chores freed up MFDC resources. Nothing in the record suggests that MFDC members relied on Ndom to inform them about their meetings. And when Ndom unwittingly carried dynamite to a bridge, he was not alone. Thus, his participation was unnecessary as others were already following the order. In short, no evidence supports USCIS' conclusion that Ndom's teenage contributions to the MFDC [were] material.

P. 5/7/18 Br. 24. The court is unpersuaded by this reasoning.

The mere fact that Ndom was a teenager during the period when he was a member of MFDC does not preclude him from providing the group with material support. And the court is not convinced that MFDC's failure to pursue Ndom after he left the organization undermines USCIS's conclusion that he provided material support during the period when

he *was* a member.

Regarding the bridge incident, Ndom appears to argue that because there were many others who *also* transported bags to the bridge, and because the bridge would have been destroyed even without his participation, his support cannot have been material. This contention is somewhat akin to arguing that, because he was not the "but for" cause of the bridge destruction, he could not have been a contributing cause. The court rejects this argument. As defendants persuasively argue, "Ndom's argument . . . ignores the fact that *he* did those things and thus someone else did not have to." Ds. 5/29/18 Br. 16. Even if his participation was not *necessary* to effect MFDC's ultimate purpose (destruction of the bridge), Ndom still provided a "valuable resource," in the form of his labor. And to the extent Ndom asserts that he believed he was transporting gold or diamonds when he carried the bags to the bridge, the "transfer of funds or other material financial benefit" is explicitly enumerated in the statute as an example of "material support." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI).

In sum, there is clear evidence in the record that, during the period of his membership, Ndom provided "material support" to MFDC by informing others about meetings (i.e., recruiting), and by providing his own labor in support of the group's activities (i.e., transporting explosives that were used to destroy a bridge). USCIS's conclusion is supported by the record, and USCIS did not act arbitrarily or capriciously in finding that Ndom's activities amounted to "material support" of MFDC, a Tier III undesignated terrorist organization.

F

Because the court holds that Ndom has not met his burden to establish that USCIS

acted arbitrarily and capriciously in concluding that he was inadmissible under 8 U.S.C. §

1182(a)(3)(B)(i)(I), it grants USCIS's motion for summary judgment on Ndom's APA claim

and related request for a declaratory judgment under the DJA. The court denies Ndom's

motion for summary judgment on these same claims.

\* \* \*

Accordingly, for the reasons explained, the court denies Ndom's motion for summary

judgment, grants USCIS's motion for summary judgment, and enters judgment today

dismissing this action with prejudice.[12]

**SO ORDERED**.

January 28, 2019.

SIDNEY A. FITZWATER
SENIOR JUDGE

---

[12]In reaching this decision, the court is not unsympathetic to Ndom's position. His involvement with MFDC began when he was only a teenager, and it ended in 1993. There is no indication in the record that, during the time when he has lived in the United States as a refugee, he participated in any type of activity that could be viewed as supporting MFDC. Having been granted asylum in 2005, it would have been reasonable for Ndom to conclude, given that his factual circumstances had not changed in the interim, that his Application would be granted. But due to the procedural posture of this case, the court cannot conclude that all of the elements of collateral estoppel are satisfied. And because the court owes the decision of USCIS great deference with respect to the determination that Ndom is inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I), and Ndom has not demonstrated that in denying his Application USCIS made a clear error in judgment, the court is unable to conclude that USCIS's decision must be set aside under the APA's narrow arbitrary and capricious standard.